# EXHIBIT C



INVESTIGATION REPORT

# Nigeria Supply Chain

Sub-contractor invoice fraud resulted in substantial overcharging

................................................................................................

GF-OIG-21-002
9 March 2021
Geneva, Switzerland



# What is the Office of the Inspector General?

The Global Fund has zero tolerance for fraud, corruption, human rights abuses, and waste that prevent resources from reaching the people who need them. Through its audits, investigations and advisory work, the Office of the Inspector General safeguards the Global Fund's assets, investments, reputation and sustainability, reporting fully and transparently on abuse.

If you suspect irregularities or wrongdoing in programs financed by the Global Fund, you should report them to us.

**Online Form >**
Available in English, French, Russian, Spanish
**Email:** hotline@theglobalfund.org
**Free Telephone:** +1 704 541 6918

**Learn** about fraud, abuse and human rights violations at the OIG's e-learning site, **www.ispeakoutnow.org**



## Table of Contents

1. Investigation at a glance                                                                 3
    1.1. Executive Summary                                                                   3
    1.2. Genesis and Scope                                                                   3
    1.3 Findings                                                                             4
    1.4 Context                                                                              4
    1.5 Impact of the investigation                                                          5
2. Findings                                                                                  6
    2.1 Zenith Carex inflated invoices for cold chain commodity distribution services ten-fold, defrauding the Global Fund of US$3 million    6
    2.2 Chemonics' Field Office controls were poorly implemented and ineffective at preventing fraud    10
    2.3 Collusion could have contributed to the fraud remaining undetected                   13
    2.4 Chemonics' financial monitoring and oversight were ineffective at detecting fraud    15
3. Global Fund Response                                                                     17
Annex A: Methodology                                                                        18

9 March 2021
Geneva, Switzerland

2

# 1. Investigation at a glance

## 1.1. Executive Summary

Between 2017 and 2019, Zenith Carex ('Zenith') defrauded Global Fund-supported programs of US$3 million by systematically inflating invoices for the distribution of health commodities to warehouses and health facilities throughout Nigeria. Zenith was a sub-contractor of Chemonics International ('Chemonics'), who managed an integrated supply chain for Global Fund Principal Recipients in Nigeria and the United States Agency for International Development (USAID). Chemonics approved and paid Zenith's fraudulent invoices for over two years. Combined with Chemonics' percentage-based contract management fees, the fraud resulted in over $3.4 million in non-compliant expenditures charged to the Global Fund.

Chemonics' controls were poorly implemented by negligent staff who missed key red flags when reviewing Zenith's invoices. Inadequate financial monitoring in the local office and US-based Headquarters, combined with potential collusion between Chemonics and Zenith staff, allowed the fraud to remain undetected, despite significant budget overruns in the Global Fund contract, as well as a 75% contract ceiling increase for Zenith.

As a result of this investigation, Chemonics has severed its relationship with Zenith, terminated relevant staff and improved its internal controls. By identifying fraud as a leading cause of budget overruns on the Chemonics contracts, the Global Fund has strengthened the sustainability and cost effectiveness of its Nigerian supply chain.

## 1.2. Genesis and Scope

In April 2019, the Global Fund Nigeria Country Team alerted the OIG after Chemonics made a retroactive request for additional funds and forecast multi-million-dollar budget overruns on their fixed-price Global Fund contracts. The Country Team engaged the Local Fund Agent (LFA) to examine potential causes of the overspend, which led to the identification of numerous unsupported sub-contractor expenditures. As neither the outcome of the LFA work nor statements from Chemonics fully explained the root cause or extent of the budget overruns, the OIG opened a proactive investigation into potential fraud in the supply chain.

The OIG reviewed over US$20 million in third-party logistics provider charges to the Global Fund from 2017 to 2019, reviewing documentation for six key logistics providers and analyzing invoices and proofs of delivery. The OIG conducted two field missions to Chemonics' Abuja office, interviewed various logistics providers, and visited warehouses in Abuja and Calabar.

Chemonics' Office of Business Conduct (OBC), cooperated closely with the OIG and provided extensive documentation. The OIG and OBC conducted a joint field mission to Abuja in February 2020. Zenith assisted investigators by attending interviews but provided limited documentation in support of their statements.

## 1.3 Findings

- Zenith inflated distribution invoices up to ten-fold and misrepresented the services executed, resulting in overcharging of US$3 million.

- Chemonics' controls were ineffective in identifying the fraudulent invoices. Staff were negligent in reviewing the invoices and supporting documentation, and approved inflated invoices that were not in line with the contracts, for over two years.

- There was evidence of collusion between Zenith and Chemonics staff, including a key Director who approved all of Zenith's fraudulent invoices and who sat on the tender evaluation panel. Zenith's tender submission contained willful errors and omissions, and suspicious bid pricing.

- Chemonics' inadequate financial monitoring in the local office and Headquarters led to retrospective identification of cost overruns, making it more difficult for Chemonics and the Global Fund Secretariat to identify the fraud.

## 1.4 Context

Since 2003, the Global Fund has disbursed over US$2 billion in Nigeria. The country faces significant health challenges: it has the highest malaria burden in the world (one in four cases globally), the world's fourth-largest tuberculosis burden, and in 2018, 1,900,000 Nigerians were living with HIV. Logistics are hampered by variable infrastructure quality, the sheer size of the country and the geographic spread of its population, as well as security and seasonal climatic challenges.

Chemonics, a global development firm based in Washington, D.C, has worked with the Global Fund on technical assistance and logistics projects in 12 countries. In Nigeria, via third-party logistics providers as shown in figure 1, Chemonics manages central and regional warehouses, Long-Haul distribution between warehouses, and Last Mile Distribution to 16,000 health facilities, for both pharmaceutical and cold chain commodities. Chemonics also oversees malaria bed net distribution, waste disposal, and transportation of samples to laboratories. Of US$27 million in total Global Fund expenses from 2016–2019, third-party logistic costs accounted for US$18.7 million, of which US$11 million was for Long-Haul and Last Mile Distribution.



*Figure 1: Relationships between Nigeria Supply chain partners, including various warehousing and Long Haul and Last Mile distribution vendors*

Chemonics also implements the Global Health Supply Chain project for the United States Agency for International Development (USAID) in Nigeria. Global Fund and USAID share costs for warehousing and integrated Long-Haul and Last Mile distribution. Many logistics invoices include costs to both donors, which Chemonics then allocates in line with the facilities supported by the donor. This document refers to 'the Program' when describing the integrated supply chain or charges to both donors for integrated services. However, this Report contains conclusions pertaining solely to the Global Fund OIG's investigation, and does not make any representations on behalf of USAID.

## 1.5   Impact of the investigation

This investigation uncovered a systemic invoice fraud which drove up the cost of distributing specialist HIV cold chain commodities between and from warehouses in Abuja, Lagos and Jos to 400 health facilities nationwide. The fraud was a significant factor in Chemonics' subsequent requests for additional funding from the Global Fund. Unsustainable costs affected the financial viability of the supply chain in supporting the fight against the three diseases in Nigeria.

Chemonics has now ceased working with Zenith, taken administrative action against certain employees, and improved controls and oversight over key Field Office processes. The OIG and the Secretariat have agreed management actions to improve the monitoring of projects and risk in strategic, high-value, cross-portfolio suppliers such as Chemonics.

US$3,429,253 of distribution costs invoiced by Zenith, inclusive of Chemonics' associated management fees, were fraudulent and non-compliant. The OIG recommends the Secretariat recovers US$3,155,514, and will evaluate the referral of the investigation findings to Nigerian law enforcement authorities. Due to the findings of this report, the Secretariat has ensured Zenith is no longer providing any service to Global Fund supported programs in Nigeria.

# 2. Findings

## 2.1 Zenith Carex inflated invoices for cold chain commodity distribution services ten-fold, defrauding the Global Fund of US$3 million

Zenith was the primary vendor for both Long-Haul distribution (between warehouses in Abuja, Lagos and Jos) and Last Mile Delivery ("LMD") of cold chain commodities - specialized, low volume items such as HIV testing reagents - to 400 health facilities across Nigeria. Despite cold chain being a low-volume commodity compared to the overall commodities distributed in Nigeria, Zenith's costs were disproportionately high: over one-quarter of total LMD fees, and approximately half of total Long-Haul charges.



*Figure 2: Map of Nigeria*

**Zenith inflated Long-Haul invoices, overcharging the Global Fund by US$712,588**

Zenith was paid US$766,223 for Global Fund-related Long-Haul cold chain services, which under the terms of the contract were valued at US$53,636. Zenith defrauded the Global Fund by US$712,588, or 93% of the total charges, by invoicing for **truck tonnage** (the gross weight of the trucks used to transport goods). This was contrary to the distribution contract, and Chemonics' Request for Proposal (RFP) to potential vendors, which stated that Long-Haul cold chain charges were to be based on **commodity weight** (the actual kilogram weight of the goods transported).

This scheme started from the first invoice Zenith submitted to Chemonics in August 2017, which charged US$33,953 for transporting 60,000 kilograms from Abuja to Jos. Zenith inflated the charges tenfold: supporting documentation revealed that only 6,009 kg of packaged commodities had been transported, which should have cost US$3,400. Zenith continued invoicing in truck tonnage until June 2019, invoicing from 2 tons (2,000 kg) to 215 tons (215,000kg) on 113 routes.

In July 2018, Zenith charged the Program US$159,972 for a 210-ton delivery from Abuja to Lagos Premier Medical Warehouse, the single highest charge invoiced for a Long-Haul route. OIG found the 210-ton charge, equivalent to multiple shipping containers, implausible based on the total volume of cold chain commodities in the supply chain: the largest single import of cold chain commodities into Nigeria was nine tons, also in July 2018. Supporting documentation (Proofs of Delivery, "POD") showed only two vehicle movements on the route; OIG calculated the charge should have been US$11,198 for an estimated 14,700 kilograms of packaged commodities.

Zenith confirmed invoicing Long Haul based on truck tonnage, saying this reflected the vehicle volumes required to transport the commodities. Zenith claimed they received verbal approval to charge by truck tonnage in a 2017 meeting with a former Chemonics procurement specialist, but could provide no records, or contract amendment, to support this.

Additionally, Zenith misrepresented the capacity of the vehicles deployed, increasing the overcharging. Several charges were beyond the capacity of the vehicles in Zenith's fleet. Different routes completed by vehicles with the same registration were invoiced at different tonnages, with some charges exceeding vehicle tonnage. For example, one vehicle with an estimated gross truck weight of seven tons was associated with invoiced charges for 5, 10, 15, 25, 35 and 75-ton routes.

Following the Local Fund Agent's review in 2019, Zenith changed its invoicing practice and began invoicing in commodity weight rather than truck tonnage. The commodity weight charged, however, continued to be fraudulently inflated by up to ten times. A 3 March 2020 POD did not have any box or shipment weights recorded from the dispatch or delivery warehouse, indicating Zenith recorded unverified commodity weights after the delivery cycle, to match the fraudulent invoice.

**Zenith fraudulently inflated Last Mile Delivery invoices by US$2.3 million**

From May 2017, Zenith misrepresented its delivery practices and inflated LMD invoices for a period of over two years, overcharging the Global Fund by US$2,284,518, or 91% of US$2.6 million LMD fees. Zenith invoiced the Program for expensive '**direct**' deliveries, defined in the RFP as dedicated delivery to **three facilities or less**, when they should have charged for '**drops**', defined as **more than three health facilities per route,** resulting in extensive overcharging. These definitions for the two LMD route types - drop and direct - were not included in the distribution contract.

The OIG reviewed over 3,000 PODs and found Zenith usually deployed one vehicle per state for LMD. Deliveries for all health facilities in a state were typically loaded concurrently into the same vehicle at dispatch warehouses. The vehicle would then deliver to between five and 20 health facilities over a two/three-day period before returning to the warehouse. These deliveries should have been charged as 'drops', because the trucks visited more than three facilities, but Zenith predominately charged for 'direct' deliveries. Zenith's mean 'direct' rate was 32 times more expensive than the equivalent 'drop' rate for the same route, leading to extensive overcharging. This practice was evident in Zenith's deliveries across all of Nigeria throughout the life of the project.

> **Example.** On 26 March 2018, a Zenith vehicle in Abuja was supplied with orders for 14 health facilities in Edo state. The vehicle completed all 14 deliveries on 27 and 28 March. As the truck delivered to more than three health facilities, 'drop' rates should have applied. Instead, Zenith charged **US$16,881** for 11 separate 'direct' deliveries from Abuja; if 'drop' prices had been applied, the charge would have been **US$586**.

**Tender awarded on 'drop' pricing**

Chemonics awarded the 2017 tender to the lowest price, technically qualified bidder. The financial evaluation only took 'drop' prices into account, indicative of the intended delivery method. Direct rates were higher to compensate for the fixed expense of driving directly from the warehouse to the first health facility on a route, and were anticipated to be used for high-volume or emergency deliveries. Zenith's drop prices were around two-thirds cheaper than their competitors, while their direct rates were by far the highest. On average, Zenith needed to complete 32 'drop' deliveries to generate the same revenue as one single direct route. By comparison, other bidders' direct prices were between three and nine times higher than drop prices. Chemonics failed to identify, even when Zenith's sub-contract ceiling was raised in May 2019 due to a cost overrun, that very few drop deliveries were being invoiced.

Chemonics confirmed the 'drop' and 'direct' definitions were not included in the distribution contracts. Chemonics told investigators they intended that 'direct' rates would apply for routes to one to three health facilities within one Local Government Area (LGA), and 'drop' rates for four or more'; however, the definitions of the two route types in the RFP did not refer to LGAs. Other interviewees stated a route should start and finish at a warehouse.

Zenith consistently charged for numerous 'direct' routes, when the same vehicle delivered to multiple health facilities on the same day, exploiting their own LGA-based interpretation of route, which lacked a contractual basis and did not provide value for money for donors. Zenith charged separate direct fees from the warehouse to each health facility visited on a route by the same delivery vehicle.

> **Example.** In April 2019, a Zenith truck delivered to six facilities in four neighboring LGAs in Ibadan, in the space of three hours. Zenith charged the program for four separate Lagos-Ibadan direct deliveries.

OIG found the 'LGA' definition, while aligned to Zenith's practices, was inconsistent with other distributors, who routinely charged for a single route for deliveries from central warehouses to facilities in multiple LGAs involving only one truck. Zenith further overcharged by invoicing the Program for multiple 'direct' rates within the same LGA, failing to adhere even to the broadest definition of routes.

> **Example.** In January 2019, one Zenith vehicle dropped supplies to 11 facilities in Adamawa, including four facilities in Yola North LGA. Zenith invoiced nine direct routes, including two for the Yola North deliveries, failing to invoice drops in line with even the broadest possible interpretation of routes. By contrast, another vendor completing non-cold chain LMD in Adamawa in September 2018 completed 12 direct routes, seven of which delivered to facilities in different LGAs.

In 2019, Zenith told Chemonics that their 2017 'drop' rates, on which they won the tender, were below cost. The OIG found Zenith's 2017 bid pricing – with very low drop and very high direct rates – was suspicious, and likely undercut competitors with an artificially low drop cost as part of a 'bait and switch' scheme, where Zenith intended to incorrectly charge for the more expensive 'direct' rates. Zenith increased the proportion of more expensive direct routes over time. In May 2017, 78% of the routes invoiced by Zenith were 'drops'. The number of drop routes then steadily decreased to 2% in January 2019, resulting in significantly higher costs per cycle, as shown in Figure 3.



*Figure 3: Number of routes (Left Axis, lines) per type and resulting total cost (Right Axis, bars), select months only.*

Zenith responded that they prepared routes and invoices per Local Government Area. They rejected the OIG's findings as a 'total falsehood' but did not provide evidence that altered the OIG's conclusions.

Chemonics agreed that Zenith defrauded the Program through deceptive practices. Chemonics proposed the Global Fund's recoverable amount consider the reasonable economic value of the services completed. The OIG agreed that distribution services were largely executed on time and in full. Acknowledging the 'bait and switch' of Zenith's aggressive bid pricing, and that some routes at the contractual prices may have been below the cost of service, the OIG adjusted the proposed recoverable amounts to be based on the next-cheapest 2017 bid. These adjustments (proposed recoverables: Long-Haul US$607,887 and LMD US$2,115,480) are reflected in the difference between the non-compliant and proposed recoverable amounts presented in the Executive Summary.

Chemonics also requested the recoverable amount be adjusted to reflect their stated intention for Local Government Areas to be a feature of the drop/direct LMD pricing definitions. Based on the evidence obtained in the investigation, the OIG concluded not to adjust the amount in that manner.

Based on the above, the OIG and the Global Fund Secretariat have agreed that:

**Agreed Management Action 1:**

Based on the findings of this report, the Secretariat will finalize and pursue from Chemonics an appropriate recoverable amount from the non-compliant expenditures identified in this report. This amount will be determined by the Secretariat in accordance with its evaluation of applicable legal rights and obligations and associated determination of recoverability.

**Agreed Management Action 2:**

The Secretariat, in consultation with the OIG, will report findings of Zenith Carex's supplier misconduct for potential referral to the Sanctions Panel.

## 2.2 Chemonics' Field Office controls were poorly implemented and ineffective at preventing fraud

Chemonics' Nigeria Field Office was responsible for all aspects of managing third-party logistics providers, including selecting vendors, drafting contracts, and reviewing and approving invoices.

Chemonics staff were negligent in their implementation of controls. Staff reviewed and approved vendor invoices without fully understanding the contract terms, and inadequately reviewed supporting documentation. As a result, controls for processing invoices were ineffective in identifying the fraudulent invoices and preventing unsupported payments.

The design of the invoice payment process appeared robust: six internal documents needed sign off by up to six people from different departments, including Warehousing and Distribution and Finance, as well as one senior manager with a delegation of authority (DOA), the authorization to spend money on behalf of Chemonics. Despite Zenith's Long-Haul invoices clearly listing 'tonnage', no Chemonics staff identified, questioned, challenged or prevented the payment of 52 fraudulent invoices which were not in line with the contract charges of per commodity kilograms.

Zenith's first Long-Haul invoice, in August 2017, was approved by staff throughout the hierarchy, including the Country Director, Deputy Country Director, and Warehousing and Distribution Director, none of whom checked whether it was in line with the contract signed three months previously. Both the Deputy Country Director, who held a DOA, and Warehousing and Distribution Director had been closely involved with the vendor selection and contracting process, and would have, or ought to have, known the correct contract terms.

**Staff reviewing invoices were inadequately informed and supervised**

A Chemonics Logistics Advisor who routinely approved Zenith's invoices which fraudulently charged for vehicle tonnage told the OIG they did not know whether Long-Haul cold chain charges were to be based on commodity weight or vehicle weight.

Some Chemonics staff did not adequately review Proofs of Delivery, submitted with invoices as evidence that deliveries were correctly completed, and that invoices were accurate. On multiple occasions, Zenith's LMD invoices, containing over 1,000 pages of accompanying PODs, were approved by both the Logistics Advisor and Warehousing and Distribution Director on the same day Chemonics received them, indicating there was no proper review. Chemonics' Logistics Advisor told the OIG they did not look at PODs when reviewing invoices as this was 'too time consuming'. In not doing so, Chemonics staff could not ensure invoiced charges were accurate and supported.

A lack of resources for invoice processing was cited as a contributing factor. Sometimes, one single staff member was responsible for reviewing all invoices, and thousands of pages of supporting documents. When long delays in releasing payments ensued, supplier complaints created pressure on Chemonics to quickly reduce the backlog. Chemonics employees from other departments were drafted in to review invoices, however these 'surge' staff could not formally approve documents. One Logistics Advisor admitted to signing their name on Inspection Forms for invoices reviewed by other people. There was no record of Chemonics managers ensuring adequate training or oversight for 'surge' staff, or processes for maintaining a segregation of duties for non-Warehousing and Distribution staff assisting in peak periods.

**Manager checks were inadequate**

The Warehousing and Distribution Director, who directly oversaw the invoice approval process, did not undertake adequate checks. The Director signed off every fraudulent invoice identified during the investigation, thereby confirming that deliveries were completed as per order requirements and invoices were reviewed and cleared for payment. When confronted with the fraudulent invoices, the Director stated

the team had "reviewed the wrong thing", without explaining their own failure to ensure the accuracy of invoices or to ensure staff were adequately trained and supervised.

Staff did not check the accuracy of invoices, instead over-relying on the sign-off of preceding staff, weakening the effectiveness of controls. One Finance Manager stated that their department focused on reviewing Payment Request Forms, an internally produced document, rather than the underlying invoices, because they relied on Warehouse and Distribution staff to confirm invoices as accurate. Finance checked whether per-kilogram rates aligned with the contract, but were unaware that Long-Haul invoices should have been charged by commodity kilogram, not vehicle tonnage.

Extraordinarily high invoices went unchallenged, including US$330,000 for just eight Long-Haul routes in July 2018 invoice, representing 10% of the entire Zenith annual contract ceiling for Long-Haul and Last-Mile Delivery combined. By comparison, even at the inflated rates, the July 2018 Last-Mile Delivery to around 400 facilities cost US$412,000.

**Red flags in the tender process**

Chemonics staff missed red flags in Zenith's 2017 tender submission. Zenith submitted unaudited 2016 financial statements with altered entries from the corresponding 2015 audited statements, which misrepresented its financial position by inflating its 2016 turnover by NGN 102 million (67%) compared to the official records held by the Nigerian Corporate Affairs Commission. The statements also showed an unexplained NGN 131.6 million (600%) increase in year-end net assets and lowered liabilities, thereby improving their balance sheet.

Concerned that Zenith was "high risk" financially due to low liquidity and significant liabilities, Chemonics questioned Zenith on its debt levels. Zenith replied that *"it [the debt levels] was erroneously captured in the [2016] management account we submitted due to exigency however our real audited account will be ready by first week in July and we shall submit it to you…In addition we can print our Bank Statement to show our bank balance as at date which is over N70m and $58,000 for your perusal."*

Despite Zenith's admission that its management statements were 'erroneous', Chemonics did not request any subsequent supporting documentation to corroborate the significant financial turnaround from Zenith's 2015 audited statements, which reported year-end liabilities of NGN97 million and cash of only NGN458,000 (approximately US$2,300).

Chemonics identified the Zenith bid as an outlier: their LMD drop prices were up to two-thirds lower than competitors, yet their direct prices were often over double the competitor average. Unlike other bidders, Zenith did not submit a cost narrative detailing how their bid was calculated, as required in the RFP, and Chemonics did not subsequently request them to do so. As this was a blind financial evaluation, Chemonics bid evaluators did not know the low bid came from Zenith and appear to have taken the peculiar costs at face value. Subsequent to the bid award, no additional monitoring was put in place. During 2019 renegotiations, Zenith stated their 'drop' rates were below cost and requested to increase this price.

**Shortcomings in contract drafting and implementation**

Shortcomings in Chemonics' drafting and monitoring of distribution contracts contributed to an overall environment where Zenith's fraud was able to take root and remain undetected.

Key LMD definitions such as 'drop' and 'direct' were not included in the final contracts, despite being outlined in the RFP. Although Chemonics defined commodity weight as the relevant metric for Long-Haul cold chain invoices, the OIG found no established process to reliably measure and record the commodity weight of consignments at dispatch warehouses. Following a Global Fund LFA review in early 2019, staff at Abuja Premier Medical Warehouse were instructed to weigh shipments. However, the inadequate scale provided meant staff had to measure a sample of commodities and extrapolate the weight. Seemingly unverified and

11

exaggerated weights were recorded by hand on PODs submitted by Zenith in support of their inflated invoices from mid-2019, indicating that a weighing process remained poorly, if at all, implemented.

Many Zenith route plans did not contain the level of detail required in the contracts, such as estimated cost, States and Local Government Areas covered by each route, volume of health commodities, vehicle registration and capacity, and the expected loading and delivery dates. Some route plans contained non-existent LGA names. The OIG found no indication of Chemonics staff challenging the route plan quality, or holding Zenith to the contractual standard.

Contracts stated that in addition to paper PODs, electronic proofs of delivery (ePODs) and GPS were to be implemented on 25% of routes by September 2017, and all deliveries from January 2018. However, ePODs on the project were not implemented at all during the period in scope.

The Global Fund selected Chemonics as a supplier to help address supply chain deficiencies which had been identified in the OIG's 2016 Audit of Global Fund grants in Nigeria. During the contract, on time and in full commodity delivery was largely fulfilled; programmatic considerations were the core focus for both Chemonics and the Global Fund. However, as this investigation identified, Chemonics' controls failures limited the Global Fund's ability to monitor financial performance of the contract.

As a Global Fund supplier, the assurance mechanisms around Chemonics were relatively more reactive than for grant implementers. Outsourcing a service includes outsourcing third-party risk; Chemonics' 2018 proposal highlighted their experience in Nigeria and cited "extensive oversight" of subcontractors as a benefit to the Global Fund. Nonetheless, the scale and strategic importance of contracts such as these warrant additional assurance than with other Global Fund suppliers. The OIG has agreed with the Secretariat that a more proactive assurance framework will be adopted around prime contractors and strategic suppliers in the future, commensurate with their contract values and risk exposure.

Chemonics told the OIG it *"agrees that staff members involved with the invoicing process were negligent in their duties during the review and payment process. We would, however, like to clarify that Chemonics did indeed have financial controls and standard operating procedures in place. Nonetheless, our investigations have shown that these procedures were not followed as they related to the Zenith Carex tender and invoice review processes."* Chemonics noted administrative actions and process improvements have been, and are being, implemented to strengthen the deficiencies identified through this investigation.

Zenith responded that Chemonics did not request updated 2016 audited financial documents and referred to the due diligence process being the responsibility of Chemonics. Zenith was invited, but declined, to provide the OIG with 2016-2019 audited financials and project ledgers; their response did not clarify or refute the inconsistencies identified.

Based on the above finding, the OIG and the Global Fund Secretariat have agreed that:

**Agreed Management Action 3:**

Supply Operations and Risk will establish an interim framework which provides guidance on assurances and necessary oversight of identified strategic 4PL & 3PL suppliers and/or prime contractors used by the Global Fund.

## 2.3 Collusion could have contributed to the fraud remaining undetected

The extent of Zenith's fraudulent billing and the scale of control lapses at Chemonics indicates the possibility of collusion between Chemonics staff and Zenith.

The contract award was very lucrative for Zenith. The first-year distribution contract value (May 2017 – May 2018), over NGN 1 billion per year, was over six times Zenith's previous annual turnover.[1] In 2018, Zenith derived NGN1.5 billion (US$4 million) in revenue from Chemonics alone – ten times their 2016 turnover. In the RFP, Zenith undertook to significantly expand their vehicle fleet if awarded the contract.

**Key Chemonics manager's lifestyle contradicted their declared salary**

A Chemonics Director who was in a position to be aware of the fraud was living substantially beyond their Chemonics salary. The individual was on the Committee which evaluated third-party logistics provider bids and set contract terms, including the commodity weight charging for Long-Haul cold chain, and the definitions of 'direct' and 'drop' for Last Mile Delivery. This individual signed off on all Warehousing and Distribution invoices and oversaw the invoice review process.

Despite not declaring any secondary employment or income, they made a housing project investment in excess of their entire salary between October 2017 and January 2019. Between March and November 2019, the individual deposited additional cash equivalent to 25% of their annual salary (which was separately credited into their account) into various bank accounts in their name. Other major expenses and luxury purchases further indicated a lifestyle that far exceeded their Chemonics salary.

**Zenith's bid pricing was suspicious**

In 2019, driven by its new Country Director, Chemonics sought discounts from all its logistics vendors through a renegotiation process, with existing vendors invited to submit new, lower rates. Chemonics staff prepared an initial price comparison dated 1 August 2019 and a further pricing analysis document on 26 August, following a request for further vendor discounts.

Zenith's revised LMD cold chain pricing, submitted on 26 August, mirrored and undercut by a fraction of one percent, that of the lowest bidder (Competitor A) for most direct rates. This strongly indicates Zenith's bid benefited from unfairly obtaining competitors' pricing during the biding process.

Zenith's updated prices were 99% of Competitor A prices for both 'drop' and 'direct' rates, as shown in Figure 4, below. Despite being requested to lower their bids, 93 of Zenith's 111 revised 'drop' rates actually *increased* to 99% of Competitor A's bid, in some cases doubling or tripling their 1 August prices. Zenith's 111 'Direct' prices were modified, often by over 50%, to become 98.4% - 99.9% of Competitor A bids per route.

| Route | Zenith 1 Aug rates | | Zenith 26 Aug rates | | Competitor A | | Zenith 26 Aug rate: % of Competitor A | |
|---|---|---|---|---|---|---|---|---|
| | Drop | Direct | Drop | Direct | Drop | Direct | Drop | Direct |
| ABUJA-ABIA | 30,000 | 300,000 | 32,600 | 149,700 | 33,185 | 150,051 | 98.24% | 99.77% |
| ABUJA-ADAMAWA | 45,000 | 350,000 | 49,400 | 203,850 | 50,725 | 204,457 | 97.39% | 99.70% |
| ABUJA-ANAMBRA | 17,000 | 450,000 | 35,000 | 150,950 | 35,210 | 151,388 | 99.40% | 99.71% |
| ABUJA-BORNO | 60,000 | 600,000 | 50,300 | 241,900 | 50,600 | 242,627 | 99.41% | 99.70% |
| ABUJA-CROSS RIVER | 35,000 | 300,000 | 38,600 | 209,800 | 38,980 | 210,040 | 99.03% | 99.89% |

*Figure 4: Extract of 2019 LMD Cold Chain price comparison, showing the change in bids from Zenith Carex to mirror the bid of 'Competitor A'.*

---

[1] 2016 Corporate regulator returns declared turnover of NGN 153 million.

Some Chemonics staff justified retaining Zenith during the renegotiation on the basis that they were the only competent LMD cold chain provider. The evaluation metric for the 2019 renegotiation changed after prices were received. Chemonics initially evaluated prices on 1 August 2019 based on 100% 'drop' rates. A Warehousing and Distribution staff member told procurement staff that 'direct' rates applied only in exceptional cases, encouraging the evaluation to be based on 'drop' pricing. This contradicted reality: as shown in Figure 1 on page 8, Zenith invariably charged 'direct' prices. On 6 August, analysis based on 0% drop rates produced results that awarded no routes to Zenith, but many to Competitor A. A subsequent evaluation based on the suspicious 26 August prices detailed above, and weighted with 99% drop rates, awarded Zenith the majority of routes.

The OIG, via Chemonics, sought comment from the former employee implicated by the collusion indicators, but they did not respond. Chemonics terminated their dealings with Zenith and took decisive disciplinary action related to associated staff.

Zenith responded to the OIG that *"Zenith Carex did not have any personal or official relationship with any staff of Chemonics before winning the sub-contract, and maintained professional relationship with the staff of Chemonics until we discontinued working for them*." Zenith made no substantive comment refuting the finding of submitting suspicious pricing during the renegotiation, stating instead that they considered Chemonics' request for a price renegotiation to be "fraudulent".

## 2.4 Chemonics' financial monitoring and oversight were ineffective at detecting fraud

Inadequate financial monitoring by Chemonics led to late identification of cost overruns, making it more difficult to identify fraud for Chemonics and the Global Fund Secretariat alike. Chemonics' Headquarters did not identify fraud as a root cause of a substantial 3PL cost increase, nor irregularities in Chemonics' Abuja Field Office invoice review, which had been compromised by negligence and potential collusion.

Chemonics' Headquarters oversight focused on strategic and programmatic issues; they did not monitor individual third-party logistics provider sub-contracts, or complete secondary checks on invoices. These responsibilities remained with Field Offices, who oversaw individual sub-contracts, including monitoring contract ceilings, an annual maximum contract value. Headquarters prepared donor financial reporting based on aggregated logistics costs, from which Global Fund invoices were prepared approximately every two months.

Prior to May 2019, financial monitoring was based on booked expenses from the Field Office; nobody was responsible for accruals monitoring, and reliable forecasting tools were unavailable. Delays in processing invoices resulted in financial monitoring being several months behind actual costs, meaning there was no contemporaneous monitoring of either Global Fund expenditure or sub-contractors' contract ceilings; the logistics providers themselves often requested extensions from Chemonics when ceilings were neared or breached.

To address these weaknesses, Chemonics implemented a 'Situation Room', a cross-department Field Office unit monitoring logistics invoices and accruals, to facilitate shared access to financial information and improve communication for both Field and Headquarters staff from May 2019.

**Retrospective overruns**

On 1 May 2019, with just 16 days remaining in the contract period, Chemonics signed a ceiling increase modification for Zenith of over US$2 million, representing a 75% increase of the annual ceiling. The request, prepared by the Field Office, was signed off by Headquarters because the value surpassed local delegation of authority.

This contract ceiling extension represented a significant missed opportunity to identify and act on Zenith's massive overspending. Despite the scale and timing of the increase, it did not trigger any specific Headquarters approval process or analysis to identify its root cause: Zenith's systemic invoice fraud. Nor was Zenith's invoicing for expensive 'direct' deliveries identified or rectified, despite Chemonics awarding the LMD contract on 'drop' prices. There was no process or requirement to notify the Global Fund of increases to underlying third-party logistics provider contract ceilings.

In December 2018, Chemonics asked the Global Fund for a US$1.7 million retroactive extension for the contract period ending August 2018. As the initial overrun was not identified until after the contract period closed, Chemonics and the Global Fund Secretariat were unable to mitigate the causes of budget pressures on the subsequent contract. On 25 April 2019, Chemonics requested a further US$3 million extension for the fixed-price contract period ending August 2019. Chemonics' extension requests to the Global Fund cited increased logistics expenses as a root cause, but did not identify fraud as a driver of cost overruns.

Headquarters-led Annual Finance Compliance Reviews found examples of invoices unsupported by Proofs of Delivery and retrospective third-party logistics providers ceiling extensions. However, the fact that the OIG identified subsequent instances of the same issues indicates these reviews did not take adequate measures to improve Field Office controls.

Chemonics' 2018 Global Fund cost proposal stated "For each of our third-party logistics providers, the Global Fund has the benefit of highly competitive market pricing with extensive oversight applied to each subcontractor both contractually as well as technically…"

Chemonics applied a percentage-based "General and Administrative Expense" and "Fixed Fee" on all contract costs, including staff salaries and logistics, to Global Fund invoices. The OIG considers the expenses and fees levied on payments related to Zenith's fraudulent charges to be recoverable. Prior to this investigation, Chemonics committed to waiving these charges on amounts over the contract ceiling; the final recoverable fees would be offset against this waiver.

Chemonics acknowledged this investigation's findings, stating they recognized the need to strengthen oversight and compliance of Nigerian warehousing and distribution services. Chemonics assert they have already implemented key changes, including changing Field Office leadership, appointing a dedicated expatriate Contracts and Compliance Director, and from Spring 2019 establishing the 'Situation Room' to enhance third-party logistics monitoring.

Based on the above findings, the OIG and the Global Fund Secretariat have agreed that:

**Agreed Management Action 4:**

The Secretariat will ensure the Nigeria invoice format from Chemonics provides sufficient data to facilitate detailed analysis by Global Fund of contract performance against signed budgets, including on an activity / line-item basis.

# 3. Global Fund Response

| Action to be taken | Due date | Owner |
| --- | --- | --- |
| 1. Based on the findings of this report, the Secretariat will finalize and pursue from Chemonics an appropriate recoverable amount from the non-compliant expenditures identified in this report. This amount will be determined by the Secretariat in accordance with its evaluation of applicable legal rights and obligations and associated determination of recoverability. | 30 September 2021 | Head, Recoveries Committee |
| 2. The Secretariat, in consultation with the OIG, will report findings of Zenith Carex's supplier misconduct for potential referral to the Sanctions Panel. | 30 September 2021 | Head, Supply Operations |
| 3. Supply Operations and Risk will establish an interim framework which provides guidance on assurances and necessary oversight of identified strategic 4PL & 3PL suppliers and/or prime contractors used by the Global Fund. | 31 December 2021 | Head, Supply Operations |
| 4. The Secretariat will ensure the Nigeria invoice format from Chemonics provides sufficient data to facilitate detailed analysis by Global Fund of contract performance against signed budgets, including on an activity / line-item basis. | 31 October 2021 | Head, Grant Management Division |

# Annex A: Methodology

**Why we investigate:** Wrongdoing, in all its forms, is a threat to the Global Fund's mission to end the AIDS, tuberculosis and malaria epidemics. It corrodes public health systems and facilitates human rights abuses, ultimately stunting the quality and quantity of interventions needed to save lives. It diverts funds, medicines and other resources away from countries and communities in need. It limits the Global Fund's impact and reduces the trust that is essential to the Global Fund's multi-stakeholder partnership model.

**What we investigate:** The OIG is mandated to investigate any use of Global Fund funds, whether by the Global Fund Secretariat, grant recipients, or their suppliers. OIG investigations identify instances of wrongdoing, such as fraud, corruption and other types of non-compliance with grant agreements. The Global Fund Policy to Combat Fraud and Corruption[2] outlines all prohibited practices, which will result in investigations.

OIG investigations aim to:

(i) identify the nature and extent of wrongdoing affecting Global Fund grants;
(ii) identify the entities responsible for such wrongdoing;
(iii) determine the amount of grant funds that may have been compromised by wrongdoing; and
(iv) place the Global Fund in the best position to recover funds, and take remedial and preventive action, by identifying where and how the misused funds have been spent.

The OIG conducts administrative, not criminal, investigations. It is recipients' responsibility to demonstrate that their use of grant funds complies with grant agreements. OIG findings are based on facts and related analysis, which may include drawing reasonable inferences. Findings are established by a preponderance of evidence. All available information, inculpatory or exculpatory, is considered by the OIG.[3] As an administrative body, the OIG has no law enforcement powers. It cannot issue subpoenas or initiate criminal prosecutions. As a result, its ability to obtain information is limited to the access rights it has under the contracts the Global Fund enters into with its recipients, and on the willingness of witnesses and other interested parties to voluntarily provide information.

The OIG bases its investigations on the contractual commitments undertaken by recipients and suppliers. Principal Recipients are contractually liable to the Global Fund for the use of all grant funds, including those disbursed to Sub-recipients and paid to suppliers. The Global Fund's Code of Conduct for Suppliers[4] and Code of Conduct for Recipients provide additional principles, which recipients and suppliers must respect. The Global Fund Guidelines for Grant Budgeting define compliant expenditures as those that have been incurred in compliance with the terms of the relevant grant agreement (or have otherwise been pre-approved in

---

[2] (16.11.2017) Available at https://www.theglobalfund.org/media/6960/core_combatfraudcorruption_policy_en.pdf

[3] These principles comply with the Uniform Guidelines for Investigations, Conference of International Investigators, 06.2009; available at: http://www.conf-int-investigators.org/?page_id=13, accessed 1.12.2017.

[4] Global Fund Code of Conduct for Suppliers (15.12.2009), § 17-18, available at:
https://www.theglobalfund.org/media/3275/corporate_codeofconductforsuppliers_policy_en.pdf, and the Code of Conduct for Recipients of Global Fund Resources (16.07.2012), §1.1 and 2.3, available at:
https://www.theglobalfund.org/media/6011/corporate_codeofconductforrecipients_policy_en.pdf. Note: Grants are typically subject to either the Global Fund's Standard Terms and Conditions of the Program Grant Agreement, or to the Grant Regulations (2014), which incorporate the Code of Conduct for Recipients and mandate use of the Code of Conduct for Suppliers. Terms may vary however in certain grant agreements.

writing by the Global Fund) and have been validated by the Global Fund Secretariat and/or its assurance providers based on documentary evidence.

**Who we investigate:** The OIG investigates Principal Recipients and Sub-recipients, Country Coordinating Mechanisms and Local Fund Agents, as well as suppliers and service providers. Secretariat activities linked to the use of funds are also within the scope of the OIG's work.[5] While the OIG does not typically have a direct relationship with the Secretariat's or recipients' suppliers, its investigations[6] encompass their activities regarding the provision of goods and services. To fulfill its mandate, the OIG needs the full cooperation of these suppliers to access documents and officials.[7]

**Sanctions when prohibited practices are identified:** When an investigation identifies prohibited practices, the Global Fund has the right to seek the refund of grant funds compromised by the related contractual breach. The OIG has a fact-finding role and does not determine how the Global Fund will enforce its rights. Nor does it make judicial decisions or issue sanctions.[8] The Secretariat determines what management actions to take or contractual remedies to seek in response to the investigation findings.

However, the investigation will quantify the extent of any non-compliant expenditures, including amounts the OIG proposes as recoverable. This proposed figure is based on:

(i)  amounts paid for which there is no reasonable assurance that goods or services were delivered (unsupported expenses, fraudulent expenses, or otherwise irregular expenses without assurance of delivery);
(ii)  amounts paid over and above comparable market prices for such goods or services; or
(iii) amounts incurred outside of the scope of the grant, for goods or services not included in the approved work plans and budgets or for expenditures in excess of approved budgets.

**How the Global Fund prevents recurrence of wrongdoing:** Following an investigation, the OIG and the Secretariat agree on management actions that will mitigate the risks that prohibited practices pose to the Global Fund and its recipients' activities. The OIG may make referrals to national authorities for criminal prosecutions or other violations of national laws and support such authorities as necessary throughout the process, as appropriate.

---

[5] Charter of the Office of the Inspector General (16.05.2019), § 2, 10.5, 10.6, 10.7 and 10.9 available at:
https://www.theglobalfund.org/media/3026/oig_officeofinspectorgeneral_charter_en.pdf
[6] Charter of the Office of the Inspector General § 2, and 18.
[7] Global Fund Code of Conduct for Suppliers, § 16-19
[8] Charter of the Office of the Inspector General § 9.1

9 March 2021
Geneva, Switzerland